AO 91 (Rev. 11/82)

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>BRENDA JOHANNA ESPINOZA | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br>14 01396 |

Complaint for violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(A)(viii)

| NAME OF MAGISTRATE JUDGE<br>HONORABLE STEPHEN H. HILLMAN | UNITED STATES MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br>July 8, 2014 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[21 U.S.C. § 841(a)(1) and (b)(1)(A)(viii)]

On or about July 8, 2014, in Los Angeles County, within the Central District of California, defendant BRENDA JOHANNA ESPINOZA knowingly and intentionally possessed with the intent to distribute at least five hundred grams, that is approximately 16.5 kilograms, of a mixture and substance containing a detectible amount of methamphetamine, a schedule II controlled substance, in violation of 21 U.S.C. Sections 841(a)(1) and (b)(1)(A)(viii).

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>MICHAEL ROUSSEVE<br>OFFICIAL TITLE<br>Special Agent – Federal Bureau of Investigation (FBI) |
|---|---|

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE⁽¹⁾ | | DATE<br>July 9, 2014 |
|---|---|---|

⁽¹⁾ See Federal Rules of Criminal Procedure 3 and 54

AUSA Scott D. Tenley x891   REC: Detention

## AFFIDAVIT

I, Michael Rousseve, being duly sworn, hereby state that:

1. I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code Section 2510(7). As such, I am empowered to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

2. I am a Special Agent ("SA") for the Federal Bureau of Investigation ("FBI") and have been so employed since July 2009. I am currently assigned to the Southern California Drug Task Force ("SCDTF"), High Intensity Drug Trafficking Area ("LA HIDTA"), Group 47. LA HIDTA is a task force comprised of agents and officers from federal, state, and local agencies, assigned to investigate large-scale narcotics.

## PURPOSE OF AFFIDAVIT

3. This affidavit is submitted in support of a criminal complaint charging Brenda Johanna ESPINOZA ("ESPINOZA") with Possession with the Intent to Distribute Methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A)(viii).

4. The information contained in this affidavit is based on my personal participation in this investigation and knowledge obtained from investigative reports, and conversations with, and

1

reviews of reports generated by, local and federal law enforcement officials. Because the purpose of this affidavit is to demonstrate that there is probable cause for the requested complaint, the affidavit does not set forth every fact learned during the course of the investigation. I have set forth only those facts that I believe are necessary to establish probable cause for the requested criminal complaint. The dates, times, and weights described below are all approximate.

## TRAINING AND EXPERIENCE

5.  I have investigated drug trafficking organizations for violations of federal laws such as money laundering, racketeering, unlawful importation of controlled substances, distribution of controlled substances, and possession with intent to distribute controlled substances, including cocaine, methamphetamine, opium, heroin, and other dangerous drugs. I have participated in several drug trafficking investigations involving the court-authorized interception of wire, oral, and electronic communications. I have personally interviewed numerous confidential sources and members of drug trafficking organizations (DTOs) and executed search warrants for evidence of drug trafficking.

6.  I am familiar with narcotics traffickers' methods of operation, including the manufacture, storage, transportation, and distribution of narcotics, the collection of money that represents

the proceeds of narcotics trafficking, and money laundering. I am aware that drug traffickers often communicate with their drug-trafficking associates through the use of cellular telephones and digital display paging devices. I am also familiar with the manner in which narcotics traffickers transport and distribute narcotics in areas they control.

7. I know that methamphetamine is a Schedule II controlled substance. I know that methamphetamine is illegal and imported into the United States in large quantities from points located in Mexico, repackaged in small quantities once it is smuggled into the United States, and sold to street level consumers.

PROBABLE CAUSE

8. During the course of my investigation, I learned the following information from Los Angeles County Sheriff Department ("LASD") Deputy Michael McPheeters ("Deputy McPheeters"):

a. On July 8, 2014, at approximately 2:00 PM, Deputy McPheeters was traveling north on Interstate 5, near Gorman, California, within Los Angeles County, in the Central District of California, and observed a 2005 Jeep Cherokee (the "Jeep") make an abrupt lane change, under heavy traffic conditions, and without using a traffic signal. After the Jeep made the illegal lane change, Deputy McPheeters paced the Jeep for approximately one-quarter mile and observed the Jeep following another vehicle very closely, at an

3

unsafe distance for the speed it was traveling. Based on those observations, Deputy McPheeters conducted a traffic stop of the Jeep to issue a warning.

b. Upon stopping the Jeep, Deputy McPheeters obtained information regarding the Jeep's license plate and registration. The license plate was registered only recently, and to an address in San Diego, near the border with Mexico.

c. Deputy McPheeters approached and addressed the driver, who was the sole occupant of the Jeep, from the passenger side window. The driver, identified as ESPINOZA, lowered the passenger side window and Deputy McPheeters immediately noticed the strong odor of air freshener coming from the interior of the Jeep.

d. Deputy McPheeters first asked ESPINOZA for her driver's license, registration and proof of insurance. He then explained to ESPINOZA the reason for the traffic stop. Deputy McPheeters asked ESPINOZA to state the purpose of her travel. ESPINOZA stated that her family was on vacation in Modesto, California and that she could not go because she had to work. ESPINOZA stated that she was travelling to Modesto to meet her family and stay through the weekend. Deputy McPheeters observed that the Jeep did not contain any luggage or other evidence consistent with ESPINOZA's stated purpose for traveling to Modesto.

e. Deputy McPheeters requested that ESPINOZA step out

of the Jeep in order to continue their conversation. ESPINOZA agreed to do so. Deputy McPheeters asked ESPINOZA whether the Jeep contained anything illegal. ESPINOZA said no. Deputy McPheeters asked whether the Jeep contained a large amount of cash or jewelry. ESPINOZA said no.

   f. Based on information learned during the course of the traffic stop and his training and experience, specifically as follows: (1) Deputy McPheeters' determination that ESPINOZA's stated purpose for travel was inconsistent with his observation of the contents of the Jeep; (2) Deputy McPheeters' observation of a strong smell of air freshener, which is often used by drug couriers to mask the smell associated with narcotics, or in an attempt to prevent detection; (3) the fact that the Jeep was recently registered which, in Deputy McPheeters' training and experience, could indicate a hidden compartment was installed in the vehicle; (4) the fact that the address of the Jeep's registration was located near the Mexican border; (5) Deputy McPheeters' experience that the I-5 corridor, including in or around Gorman, California, is a frequent route for drug couriers; and (6) Deputy McPheeters' training and experience in investigating drug trafficking activity, Deputy McPheeters asked ESPINOZA for consent to search the Jeep. ESPINOZA provided verbal consent for the search.

   g. After receiving verbal consent, Deputy McPheeters

5

requested K-9 assistance in conducting the search because he suspected the Jeep contained contraband, and knew that a K-9 unit was in the Gorman, California vicinity. Within ten minutes, K-9 LASD Deputy Ken Price responded. Deputy McPheeters observed Deputy Price walk the K-9 around the Jeep's exterior and saw the K-9 alert to the rear bumper of the Jeep. Deputy McPheeters then observed the K-9 climb inside the back passenger compartment of the Jeep and alert along the rear bench seat where the seat-back joins with the seat. Deputy McPheeters further observed the K-9 alert along the floor of the rear cargo area.

  h. After the K-9 alerted to these locations in the Jeep, the K-9 was removed from the interior of the Jeep. Deputy McPheeters then lifted the plastic molding covering the rear edge of the cargo area in order to begin conducting a manual search of the rear cargo area. Deputy McPheeters removed two nuts from the floor of the cargo area that held the cargo carpeting in place and located an access panel cut into the floor of the rear cargo area. The panel was attached to the floor with four non-factory, Phillips head screws.

  i. After unscrewing the access panel door with a screw driver from his patrol vehicle, Deputy McPheeters observed a compartment containing several packages wrapped in plastic or electrical tape containing a crystal-like substance. After observing these packages, Deputy McPheeters cut open the access panel

door using a hacksaw to obtain access to the entire compartment. Within the compartment, Deputy McPheeters located additional packages, each of similar appearance and content, for a total of nineteen packages.

j.  Deputy McPheeters subsequently located a Phillips head screw driver in the driver's side door pocket of the Jeep.

k.  Based on the discovery of nineteen packages of crystal-like substance, which Deputy McPheeters believed to be methamphetamine, ESPINOZA was placed under arrest. Subsequent to ESPINOZA's arrest, Deputy McPheeters conducted an inventory search of the JEEP and recovered a white smartphone from the center console of the vehicle, and a blue cellular telephone from the passenger seat. Deputy McPheeters then transported ESPINOZA to the Santa Clarita Sheriff's Station.

9.  I was present at the Santa Clarita Sheriff's Station when Deputy McPheeters arrived at the station with ESPINOZA at approximately 3:00 PM. During the course of my participation in the investigation, I learned the following:

a.  Before ESPINOZA arrived at the Sheriff's Station, I reviewed DMV print-outs generated by the LASD regarding the Jeep's registration and license plate. I confirmed that the Jeep was registered in ESPINOZA's name. I also learned that the Jeep's license plate was changed on June 17, 2014 and that another license

7

plate was associated with the Jeep prior to that date.

   b. At the Sheriff's Station, I conducted an interview of ESPINOZA along with LASD Detective Leon Moore ("Detective Moore"). After initially being placed in a holding cell, ESPINOZA was moved into a separate room for questioning. Detective Moore and I identified ourselves. I read ESPINOZA her *Miranda* rights and asked her if she wanted to speak with us without the presence of a lawyer. ESPINOZA agreed to speak with us without a lawyer. ESPINOZA signed a written waiver of her *Miranda* rights.

   c. ESPINOZA initially stated that she was travelling to Modesto to visit her grandmother. ESPINOZA did not know her grandmother's address or telephone number. ESPINOZA stated she intended to call her mother when she arrived in Modesto to get her grandmother's address. ESPINOZA denied knowing about the methamphetamine found in the Jeep, stating she had purchased the Jeep approximately two months ago from a private party in Mexico and the methamphetamine may have been in the Jeep when she purchased it. At this point, ESPINOZA began to cry. Detective Moore and I provided water to ESPINOZA and left the room for approximately three to five minutes to allow ESPINOZA to compose herself.

   d. When Detective Moore and I returned to the room, we confronted ESPINOZA with the implausibility of her account. ESPINOZA then stated that she knew she was transporting drugs and

8

provided the following information:

      i.   ESPINOZA regularly travels to Tijuana, Mexico on the weekends. While in Tijuana approximately four months ago, ESPINOZA met a man whom she declined to identify, who lives in Tijuana (hereinafter "Unidentified Male" or "UM"). UM asked ESPINOZA to transport narcotics into the United States in return for cash payments, and ESPINOZA agreed.

      ii.   ESPINOZA said this was her third trip from the San Diego area to Modesto for the purpose of transporting narcotics for UM. While the Jeep is registered in ESPINOZA's name, it is only used to transport narcotics and is not stored at ESPINOZA's residence. ESPINOZA only has the use of the Jeep when she is transporting narcotics.

      iii.   Prior to each trip, UM called ESPINOZA and told ESPINOZA to prepare for a trip. The Jeep, pre-loaded with narcotics, would be dropped off at ESPINOZA's residence. ESPINOZA would then drive the Jeep to Modesto and, upon arrival, call a telephone number provided to her by UM. ESPINOZA would then park the Jeep in the specified parking lot and leave the keys inside the Jeep. The Jeep would be picked up by individuals -- who ESPINOZA declined to identify -- and driven away. ESPINOZA waited in the general vicinity of the parking lot for the Jeep to be returned.

      iv.   After the Jeep was returned to the parking lot,

ESPINOZA would drive back to the San Diego area and park the Jeep at ESPINOZA's residence, where it would later be picked up by unidentified individuals. After each trip, ESPINOZA would travel to Tijuana, where ESPINOZA was paid $2,000 for each trip.

   v. During the course of the interview, ESPINOZA confirmed that the two cellular telephones recovered from the Jeep were hers, and she provided me the access codes for those telephones.

  e. During the interview, ESPINOZA agreed to provide a written statement. ESPINOZA wrote:

> "I do a favor to drive the car with a drug for a certain amount of money $2000. I have to stop in Modesto live [sic] the drug and drive back to San Diego I do thiz [sic] for 3 times. Sorry I do a mistake I promise never do it again"

  f. ESPINOZA signed her statement at or around 4:35 PM. After ESPINOZA signed her statement, I asked ESPINOZA for consent to search her cellular telephones recovered from the Jeep at the time of her arrest. ESPINOZA gave consent for the search. The interview concluded shortly thereafter. During the course of the interview, I observed that ESPINOZA spoke English fluently and had no difficulty understanding or responding to our questions.

  10. On July 8, 2014 at approximately 7:00 PM, I weighed the packages recovered from the Jeep and conducted a field test in order to determine whether the packages contained a controlled substance, as follows:

a. I opened one of the nineteen packages recovered from the Jeep, removed a small sample of the substance contained within the package, and conducted a field test of the substance. The field test for methamphetamine was positive.

b. I separately weighed three of the nineteen packages recovered from the Jeep using a scale belonging to the Santa Clarita Sheriff's Station. Each package, including its wrapping, weighed approximately 860 to 870 grams. In total, the nineteen packages therefore weighed approximately 16,340 to 16,530 grams or 16.3 to 16.5 kilograms. Based on my training and experience, the methamphetamine in ESPINOZA's possession would have an approximate street value of $653,000 if sold in single gram quantities.

c. Furthermore, I concluded, based on my training and experience, that methamphetamine in ESPINOZA's possession was for distribution and not for personal use because of the quantity and the manner in which it was packaged.

11. Based on the foregoing, I believe that there is probable cause to believe that on July 8, 2014, Brenda Johanna ESPINOZA committed the crime of Possession with the Intent to Distribute Methamphetamine, in violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(A)(viii).

//

I declare under penalty of perjury under the law of the United

States that the foregoing is true and correct and was executed on this 9th day of July, 2014.

_____
Michael Rousseve
Special Agent
Federal Bureau of Investigation

Sworn and subscribed to before me this 9\ day of July, 2014.

_____
UNITED STATES MAGISTRATE JUDGE